IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-02595-NYW-NRN

----------------------------------------------------------

VIDEO-RECORDED DEPOSITION OF
CHARLES LAMONT WILLIAMS
September 21, 2023

----------------------------------------------------------

Petitioner:

CHARLES WILLIAMS,

v.

Defendant:

COLORADO DEPARTMENT OF CORRECTIONS.

----------------------------------------------------------

APPEARANCES:

    RIGHTS BEHIND BARS
        By Samuel D. Weiss, Esq.
          416 Florida Avenue NW
          Suite 26152
          Washington, DC 20001
          sam@rightsbehindbars.org
            Appearing on behalf of Plaintiff

EXHIBIT A

```
 1  APPEARANCES (continued):

 2       COLORADO ATTORNEY GENERAL'S OFFICE
             By Ann Stanton, Esq.
 3              Gregory Bueno, Esq.
                Civil Litigation & Employment Section
 4              1300 Broadway, 10th Floor
                Denver, Colorado 80203
 5              720-508-6000
                ann.stanton@coag.gov
 6              gregory.bueno@coag.gov
                  Appearing on behalf of Defendant
 7
    Also Present:  Walt Mathern, Videographer
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1       Pursuant to Notice and the Colorado Rules
2  of Civil Procedure, the video-recorded deposition
3  of CHARLES LAMONT WILLIAMS, called by Defendant,
4  was taken on Wednesday, September 21, 2023,
5  commencing at 9:34 a.m., at the Attorney General's
6  Office, 1300 Broadway, 10th Floor, Denver,
7  Colorado, before Lisa A. Dague, Certified Shorthand
8  Reporter and Notary Public within and for the State
9  of Colorado.

                          I N D E X

DEPOSITION OF CHARLES LAMONT WILLIAMS

| EXAMINATION BY: | PAGE |
|---|---|
| Ms. Stanton | 5 |
| Mr. Weiss | 153 |

| EXHIBITS | | INITIAL REFERENCE |
|---|---|---|
| Exhibit 1 | Complaint and Request for Relief | 8 |
| Exhibit 2 | Job Program/Assignments | 36 |
| Exhibit 3 | Clinical Orders | 63 |
| Exhibit 4 | Administration Regulation, Americans with Disabilities Act-Offender Request for Accommodations | 72 |

| EXHIBITS (Continued) | | INITIAL REFERENCE |
|---|---|---|
| Exhibit 5 | BVCC Food Service Assignment, 7/13/2019 | 79 |
| Exhibit 6 | Memorandum to Charles Williams from Lt. M. Class, 9/9/2019 | 83 |
| Exhibit 7 | Message from Medical, Dr. Rose to Charles Williams, 9/8/2020 | 88 |
| Exhibit 8 | CDOC Clinical Services Lay-In Slips | 93 |
| Exhibit 9 | Offender Grievance, 8/6/19, Step 2 | 111 |
| Exhibit 10 | Offender Grievance, 12/23/19, Step 2 | 114 |
| Exhibit 11 | Offender Grievance, 11/4/19, Step 1 | 116 |
| Exhibit 12 | Offender Grievance, 12/23/19, Step 2 | 118 |
| Exhibit 13 | Offender Grievance, 1/21/20, Step 3 | 119 |
| Exhibit 14 | CHRONLOG | 125 |
| Exhibit 15 | Offender Appeal, 10/3/19 | 130 |
| Exhibit 16 | Plaintiff's Responses and Objections to Defendant's First Written Discovery Requests Plaintiff | 135 |

```
 1  later, page 13 of 16 in the top right corner, do
 2  you see where it says, "Count II - Rehabilitation
 3  Act"?
 4       A    I do.
 5       Q    Are these the two claims that you're
 6  bringing in this lawsuit?
 7       A    I believe so.
 8       Q    And there aren't any other claims that
 9  you're bringing?
10       A    I would say not at this time, right?
11       Q    Okay.  Mr. Williams, do you have any
12  disabilities or medical conditions?
13       A    I have degenerative disc disease and
14  bilateral neuropathy.
15       Q    Any other disabilities?
16       A    Diabetes, if you call that a disability.
17  I think that's it.
18       Q    Okay.  For your degenerative disc
19  disease, when were you diagnosed with it?
20       A    I want to say around 2015 is when the
21  pain started.  Jeez, within two years of that.
22       Q    Who diagnosed you with degenerative disc
23  disease?
24       A    I don't remember the doctor's name,
25  actually.
```

1       Q    When have you been convicted of a felony?
2       A    I was convicted of a few felonies in
3  1993, a few more in 2006, and then the sentence I
4  was in prison for this time, which was overturned.
5  So I was convicted of felonies, but they're gone
6  now.
7       Q    Okay.
8       A    And that was in -- gee, 2014 was the
9  conviction.
10      Q    Okay.  So the most recent conviction that
11 led to your incarceration while these events were
12 going on in 2019, that was a conviction in 2014?
13      A    Yes.
14      Q    And you said that that was vacated or
15 expunged?
16      A    Overturned, yeah.
17      Q    Overturned.
18      A    Vacated, and I no longer have the
19 felonies.
20      Q    When were you released from prison most
21 recently?
22      A    April 29th of 2022.
23      Q    Did you serve any kind of parole or
24 probation --
25      A    No.

1  them, accept them, or I don't.
2       Q    Okay.  When did you start doing that
3  work?
4       A    Rhino, I think, I'd say approximately two
5  months ago, give or take a little bit of time, you
6  know.
7       Q    Over the last approximately two months
8  that you've been doing that work, how many hours a
9  week would you say you have picked up that work or
10 how many days per week would you say you've picked
11 that up?
12      A    I can't really explain it like that.
13 That's why I mentioned it's the same as the way I
14 described Wonolo.  Some weeks I go without a job.
15 I don't have any jobs this week.  I had one last
16 week, two or three the week before.  So it's --
17 it's sporadic.  They call it part-time.  I can work
18 up to 12 hours a day, but I physically can't work
19 doing that 12 hours a day.  So I mainly just pick
20 one shift per day when I get them.  And like I
21 said, it's so sporadic like that, it's hard to
22 pinpoint an exact time.  I know I've worked maybe
23 eight shifts --
24      Q    Okay.
25      A    -- altogether since I've worked for them.

1  Q   And you said it was medical mistreatment,
2  deliberate indifference.  Were there any other
3  issues that you raised in that case?
4  A   There were three claims, and deliberate
5  indifference was the major one.  There were some
6  claims -- I remember now.  There were some claims
7  for not allowing us -- it was a religious claim for
8  not allowing us to partake in our recognized
9  religion.
10 Q   Is that case still ongoing?
11 A   No.
12 Q   What was the outcome of it?
13 A   It was settled.
14 Q   Have you filed any other civil lawsuits?
15 A   No.
16 Q   Did you work while you were incarcerated
17 in DOC?
18 A   Yes.
19 Q   What jobs did you hold?
20 A   Mainly janitorial, and I was a barber for
21 a really long time.
22     MS. STANTON:  I'm going to pass out what
23 will be marked as Exhibit 2.
24     (Exhibit 2 was marked.)
25 Q   (BY MS. STANTON)  For the record, if you

1 we really never went.
2 Q    When you had this job as a clerk in
3 recreation, were you still living in close custody
4 at that point or were you --
5 A    For a small amount of time.  And so I --
6 in close custody, I rarely ever worked, because we
7 rarely ever were allowed to go to the gym.
8 Q    Do you remember what dates you were in
9 close custody versus medium custody?
10 A    No.
11 Q    I may have another document.  I can show
12 you that later.
13 A    I think it just says it right here.  I
14 don't know if I trust this document though.  The
15 status is incorrect.  But I would assume that
16 12/30/2019 -- no, that was when I was assigned
17 there.  Yeah, you would have to produce the other
18 document, I guess.
19 Q    Okay.
20 A    I can't give you a specific date as to
21 when I remember being moved to close custody.  It
22 was a Friday, though, I know that.
23 Q    It was on a Friday?
24 A    Yeah.
25 Q    You mentioned work restrictions.  Did you

1  have work restrictions?
2     A    I did.
3     Q    When did you have work restrictions in
4  place?
5     A    All this time.  From, I want to say,
6  2017, those restrictions were placed on when I
7  started seeing Dr. Loftin, and then I had -- Damon
8  was her last name, Heather Damon, and she kept up
9  on the work restrictions.
10          (Exhibit 3 was marked.)
11    Q    (BY MS. STANTON)  I'm going to introduce
12 another exhibit here.  It may take me a moment to
13 pull out each copy.  So this is marked as
14 Exhibit 3.  And do you see in the bottom left page,
15 it says, "Williams003"?
16    A    I do.
17    Q    Do you recognize this document?
18    A    I do.
19    Q    What is this document?
20    A    It's an exhibit that I added to -- or we
21 added to this complaint.
22    Q    And what -- what does the document tell
23 us?  What --
24    A    These are clinical orders given by my
25 provider, which was Heather Damon, and these are

1 work restrictions.
2 Q And I see an encounter date that says
3 October 4 of 2018 at the top. Do you see that?
4 A I do.
5 Q Is it your understanding that these
6 restrictions were put into place on October 4 of
7 2018?
8 A Yep. So give or take 30 days, this is
9 how it works every year. So every year, these
10 restrictions have to be placed on again, and every
11 year they were placed on. They expire after one
12 year.
13 Q Okay. Was this the first year that you
14 had work restrictions in place?
15 A No. No. Dr. Loftin put most of these on
16 prior to me seeing Ms. Damon.
17 Q And I see the top work restriction, the
18 first box says, "No Standing Over 2 Hours, Due to
19 bilateral peripheral neuropathy." Do you see that?
20 A I do.
21 Q So tell me what that -- that work
22 restriction means.
23 A It was specifically for food service,
24 because food service is an 8-to-12-hour shift, and
25 if I was -- reported to work and told them I

1  couldn't do the work, then I would be terminated
2  and moved to Lower North.
3           This was not really the onset of the
4  bilateral neuropathy, but -- so to explain things,
5  we're given a certain type of shoe in prison, and
6  in those type of boots, I couldn't stand for more
7  than two hours.
8       Q   So with this work restriction, was your
9  job supervisor able to access this, or did you have
10 to bring a piece of paper in showing it?
11      A   I kept one personally just in case, but
12 yeah, absolutely, all super -- everyone could see
13 this.  This would be in my general file, so you
14 wouldn't have to have any type of higher clearance
15 to get to this.
16      Q   Okay.  So when you brought this work
17 restriction to -- to work with you or when your
18 supervisor looked it up and saw it and they saw no
19 standing over two hours, what -- what did that tell
20 them?  What -- what could they do then?
21      A   Nothing, really.  I don't understand what
22 you mean, "What could they do?"
23      Q   Would they make sure you had a break
24 to -- to sit every two hours?
25      A   I never -- I never actually worked, so --

1  are you talking about in food service?
2       Q    In any of your jobs, food service --
3       A    Well, I never -- I never actually worked
4  more than two hours in any of those other jobs per
5  day -- well, yeah, I will say it like that, per
6  day.
7       Q    Okay.  So how about in food service then?
8       A    Those shifts are 8 to 12 hours long.
9       Q    So would the supervisor give you a break
10 to sit every two hours?
11      A    I don't know.  I never actually worked in
12 food service.
13      Q    You never actually did?
14      A    No, not one day.
15      Q    So all those times that you were assigned
16 to food service, you didn't actually go to work?
17      A    No.  They knew I had these.  I showed it
18 to them a few times.  And they would just send me
19 back to my housing unit.
20      Q    Okay.
21      A    I never actually spent any time in the
22 kitchen other than eating.
23      Q    And the next work restriction down on the
24 list, it says, "No Repetitive Bending at the Waist,
25 Chronic back pain."  Do you see that?

1    A    I do.
2    Q    What is this form?
3    A    This is the offender request for
4 accommodation.
5    Q    Have you ever submitted a copy of this
6 form?
7    A    No, I have not.
8    Q    Have you ever requested any kinds of
9 accommodations, ADA accommodations?
10   A    No.
11   Q    Do you recall ever learning how to submit
12 this form?
13   A    No.
14   Q    Were you aware of any other ways that you
15 could request accommodations besides submitting
16 this form?
17   A    Prior to being terminated?
18   Q    In general.
19   A    After I was terminated, I became aware of
20 this.
21   Q    Did you -- did you submit this form to
22 request any accommodations for -- for any programs,
23 any jobs at DOC after you were terminated, after
24 you learned about this form?
25   A    No.

1  Q   Why not?
2  A   I didn't need to.
3  Q   Why didn't you need to?
4  A   Well, because my supervisor was aware of
5 my clinical orders and my back stuff.  So those
6 weren't in my duties of the job.
7  Q   Are you talking about your supervisor in
8 your custodian position?
9  A   No.  But the custodian position, the
10 supervisor was aware of that.  I only worked 20 to
11 30 minutes a day, a couple times a day, so --
12  Q   So when you said your supervisor was
13 aware, what supervisor are you talking about?
14  A   Well, the custodial supervisor in Lower
15 North, your -- these clinical orders are in your
16 general file.  So anyone, a regular CO can pull
17 this up.  But there are other -- what do you call
18 them -- pages or windows in the file that, you
19 know, you have to be allowed at a certain level to
20 be able to get into certain parts of the file.
21 These are in the general.  So any time you're -- I
22 don't want to say that either.
23         I would assume -- I'll put it like that.
24 I would assume that my supervisor was aware of them
25 because she hired me.

1  day you are assigned.  Your direct supervisor will
2  assess the need for a lay-in."
3     Q    So this assignment to the kitchen with a
4  report to work date of July 13th, did you -- did
5  you report to work every day that you were assigned
6  that time?
7     A    Yes, except for one.
8     Q    Except for one?
9     A    Except for one day.
10    Q    When was that day?
11    A    That was the day I was fired.
12    Q    If we go back to the exhibit with Job
13 Program/Assignments --
14    A    What exhibit is that?  2?
15    Q    I think that's Exhibit 2.  On the top
16 page, page 212, the very bottom line is an
17 assignment to food service, July 10th, 2019.  And
18 the as of date -- it says, "Status, Terminated, As
19 of Date July 19th, 2019."  Is that the time that
20 you were -- do you recall whether that was the time
21 you were fired for not reporting to work or was
22 that a different assignment --
23    A    No.
24    Q    -- to food service?
25    A    That was a different assignment.

1  terminated from work that day?
2      A    Will you repeat that question?
3      Q    So with all the events that we've
4  discussed on September 23rd, 2019, were you
5  terminated from work that same day?
6      A    No.
7      Q    When were you terminated from work?
8      A    I have no idea.  Some point after --
9  after -- some point after that.
10     Q    And what was the reason that was given
11 for termination from work?
12     A    Failure to work.
13     Q    Were you placed on a restricted privilege
14 status for failure to work?
15     A    No.
16     Q    Did you get a COPD charge for failure to
17 work?
18     A    No.
19     Q    Did you face any other consequences for
20 not reporting to work that day?
21     A    Yes.
22     Q    What were those consequence?
23     A    I was reclassed and sent to close
24 custody.
25     Q    Did that happen on the same day or was it