IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-02595-NYW-NRN

CHARLES WILLIAMS,

Plaintiff,

v.

COLORADO DEPARTMENT OF CORRECTIONS,

Defendant.

## CHARLES WILLIAMS'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

### RESPONSE TO STATEMENT OF UNDISPUTED FACTS

| ¶ | Defendant's Undisputed Material Facts | Plaintiff's Response and Supporting Evidence |
|---|---|---|
| 1. | Plaintiff Charles Williams is a former CDOC inmate who commenced this action while incarcerated at Buena Vista Correctional Complex, a correctional facility operated by the CDOC. *See generally* Complaint, ECF No. 1. | Admitted. |
| 2. | The CDOC is a Colorado state agency charged with supervising and controlling each state correctional facility. § 24-1-128.5, Colo. Rev. Stat; *see also* Def.'s Answer to Am. Compl. and Request for Relief, ¶ 3 (ECF No. 56). | Admitted. |
| 3. | At the time of the events giving rise to this action, Mr. Williams was incarcerated in the Colorado Department of Corrections and serving a prison sentence after being convicted of felonies in 2014. Ex. A, Deposition of Charles Lamont Williams, at 18:3-13. | Admitted. |
| 4. | Mr. Williams was fully released from CDOC custody and control on April 29, 2022 after his 2014 felony convictions were overturned. *Id.* at 18:3-25. | Admitted. |
| 5. | At all relevant times, Mr. Williams had chronic back pain (or degenerative disc disease)1 and bilateral neuropathy. *Id.* at 10:11-14; Ex. B, Clinical Orders (Williams003). | Admitted. |
| 6. | As of October 4, 2018, a CDOC clinical provider had entered clinical orders in Mr. Williams's medical record documenting that Mr. Williams had two work | Admitted but with clarification. CDOC clinical provider had |

1

|    |    |    |
|----|----|----|
|    | restrictions in effect until October 4, 2019: "No Standing Over 2 Hours" due to bilateral peripheral neuropathy, and "No Repetitive Bending at the Waist" due to chronic back pain. Ex. A, Deposition of Charles Lamont Williams, at 62:25-64:12; Ex. B, Clinical Orders (Williams003). | entered work restrictions as of 2017, not 2018. Ex. M at 64. |
| 7. | Mr. Williams was assigned to work in a variety of prison jobs over the course of his incarceration. Ex. A, Deposition of Charles Lamont Williams, at 36:16-37:22; Ex. C, Job/Program Assignments (CDOC/WILLIAMS 00212-23). | Admitted, subject to clarification that any work assignment before he developed his disabilities in 2015 is immaterial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). |
| 8. | At various times Mr. Williams was assigned to work in food service, including from approximately July 10 to 19, 2019. Ex. C, Job/Program Assignments (CDOC/WILLIAMS 00212). | Admitted, subject to clarification that he never actually worked in the kitchen during this stint. Ex. M at 80–81. |
| 9. | Mr. Williams received "lay-in" slips from CDOC clinical services restricting him from working from July 11 to August 1, 2019. Ex. D, Lay-in Slips (Williams010). | Admitted. |
| 10. | After a period without a work assignment, Williams was assigned to food service again from approximately September 10 to September 23, 2019. Ex. C, Job/Program Assignments (CDOC/WILLIAMS 00212). | Admitted. |
| 11. | Mr. Williams's supervisor in food service had access to his list of work restrictions, and Mr. Williams brought a copy of his work restriction documentation when he reported to work. Ex. A, Deposition of Charles Lamont Williams, at 65:8-15. | Admitted. |
| 12. | Mr. Williams reported to work every day he was scheduled, up until September 23, 2019, but he did not actually work in food service a single day because his supervisor would review his work restrictions and send him back to his housing unit. *Id.* at 66:9-19; 82:3-11. | Admitted. |
| 13. | On September 23, 2019, Mr. Williams informed Corrections Officer Bryan Gonzales that he was not reporting to work in the kitchen that morning as scheduled due to back pain, and that he was afforded three unexcused absences from work per month. Ex. E, Incident Report; Ex. F, Deposition of Bryan Gonzales, at 28:2-29:3; *see also* Ex. G - Pl.'s Resps. to Discovery Requests - Request for Admission no. 1. | Admitted as to the first clause of the sentence, contested as to the second clause as immaterial. |

| | | |
|---|---|---|
| 14. | Williams received a medical lay-in later that day. Ex. D, Lay-In Slips (Williams010). | Admitted. |
| 15. | Shortly thereafter, Mr. Williams was terminated from food service for failure to work. Ex. A, Deposition of Charles Lamont Williams, at 96:7-12. | Admitted. |
| 16. | On or about October 3, 2019, Williams was reclassified from medium custody to close custody due to his refusal to work. Ex. H - Classification – CDOC/Williams – 00141-00143. | Contested. This was the purported basis for the reclassification but Williams challenges it as the genuine basis, arguing that it was instead retaliation. Ex. M at 131–32; Ex. I. The sincerity and plausibility of CDOC's basis for reclassification is the primary subject of the below response brief. |
| 17. | Williams's reclassification decision was upheld on October 23, 2019 because, although Williams received a medical lay-in on September 23, he did not receive the lay-in until several hours after he refused to report to work, and food service was able to accommodate his work restrictions. Ex. I, Offender Appeal (Williams016). | Contested. This was the purported basis for the affirmance but Williams challenges it as the genuine basis, arguing that it was instead retaliation. Ex. M at 131–32; Ex. I. The sincerity and plausibility of CDOC's basis for reclassification is the primary subject of the below response brief. |
| 18. | On October 29, 2019, Williams filed a grievance seeking an interactive accommodation process regarding his food service job assignment. Ex. J - Grievance – CDOC/Williams – 0001-0002. | Contested. Williams's grievance sought the accommodation process "initiated for [him] in any/all future job placement[s]," not regarding his food service job assignment. |
| 19. | He received a response providing detailed information concerning how to request an interactive ADA accommodation process and noting that CDOC had no record that he ever requested an interactive accommodation process with food service staff. Ex. J - Grievance – CDOC/Williams – 0001-0002. | Contested. Exhibit J does not contain this information. |
| 20. | Williams never submitted any ADA accommodation requests related to his job assignments after he was terminated from food service, stating that he did not need to because his clinical work restrictions were sufficient. Ex. A, Deposition of Charles Lamont Williams, at 75:21-76:6. | Admitted. |

3

| 21. | On May 2, 2020, Williams made a disability accommodation request which pertained to his footwear rather than any accommodation for his job assignment. Ex. K, Offender Communication; Ex. L, Williams Request Approved/Denied Report. | Contested. Per Exhibit K, Williams made this request via an offender communication form, not a "disability accommodation request." *See* Ex. M at 74. |
|---|---|---|
| 22. | The Court has barred Williams from recovering damages for mental or emotional injuries. *See* Order re: CDOC's MTD – ECF No. 49 at pp. 7-12. | Objection, not a statement of fact, calls for legal conclusion. |
| 23. | Williams denies losing income or earning capacity as a result of any alleged event in this action. Ex. G, P.'s Resp. to Interrogatory No. 12. | Admitted. |

4

**INTRODUCTION**

Charles Williams has suffered from degenerative disc disease and bilateral neuropathy since 2015. Ex. M at 10–11. In 2017 he was diagnosed as such by the Colorado Department of Corrections (CDOC), and he received work restrictions that prevented him from being assigned tasks "no standing over 2 hours" and no "repetitive bending at the waist." *Id.* at 43, 63–64; Ex. B. In the years afterward, CDOC on multiple occasions assigned him to work in the facility's kitchen, an assignment generally inconsistent with his restrictions. From July 10 to July 19, 2019, CDOC assigned him to work in the kitchen, but he immediately received "lay-in" slips from CDOC medical staff, which prevented him from working there from July 11 to August 1, 2019. Ex. M at 80–81; Ex. D. Despite the assignment, he did not spend a single day working in the kitchen. Ex. M at 66.

CDOC assigned him back to the kitchen on September 10, 2019. Ex C. Williams began reporting to work, but his supervisor had access to his work restrictions, and every morning Williams reported but was turned away because of the supervisor's belief that he was incapable of working in the kitchen with his restrictions. Ex. M at 66. As time went on, Williams barely got down the hall before the kitchen staff began waving him back to his housing unit. Ex. M at 87, 92.

On Saturday, September 21, 2019, Williams put in a medical emergency request because his pain had become "unbearable." *Id.* at 91. He still, however, went down to the kitchen to report to work only to, as always, be immediately sent back. *Id.* at 92. He did the same the following day. *Id.* He was unable to see a medical official, however, because it was the weekend. *Id.* at 91. On Monday, September 23, 2019, Williams put in another emergency medical request knowing that, as this was a weekday, he would see the doctor, and she would give him a "lay-in," excusing him from work. *Id.* When the line correctional officer Bryan Gonzales came to get him to send him to

5

the kitchen, Williams informed Gonzales that he could not go to work because of his severe back pain. Ex. E. Gonzales appropriately wrote up an incident report, noting that Williams had "refuse[d] to work citing back problems." *Id.* "Refused to work" is not a moral judgment—it is a term of art that refers to all circumstances when someone does not report to work so that the facility is aware that a specific prisoner is supposed to be in the housing unit and not at their workplace. Ex. N. at 37–39. Failures to report work were very common. *Id.* at 57 ("Half of them refuse to go to work. It's comical."). Hours later, Williams saw a CDOC nurse who indeed gave him a lay-in, stating that he should not work for the next ten days. Ex. D. By stating that Williams should not work for "10 days" and that he should resume work on October 3, 2019, eleven days after September 23, the lay-in was clear that September 23 was one of the ten days for which Williams was excused from attending work. *Id.*

Weeks later, CDOC informed Williams that because he did not go through the futile act of walking to work while in severe pain, just to be sent right back, he was being fired from his job and reclassified to a higher custody level. Ex. M at 96–97. The sole ground for reclassification was that Williams had "refused to work" on September 23. Ex. H. Williams was taken off the incentive unit, where prisoners with unusually good behavior lived, which was considered between minimum and medium security. Ex. M at 100–01. He was sent not just to normal medium security but all the way to "close custody," the equivalent of maximum security, affecting every aspect of his daily life. *Id.* at 97–98. Because of his single "failure to work," and this failure alone, he spent roughly the next *two years* in this highly restrictive environment. *Id.* at 110.

In short, CDOC harshly punished Williams because, in the middle of a medical emergency, verified by its own medical officer, he did not report to a job that CDOC's own staff would not allow him to do, even on his best days. Williams believes the reason behind this Kafkaesque series

6

of events is that the classification officer was retaliating against him for a different lawsuit he brought related to religious practices.[1] Ex. M at 131–32; Ex. I. CDOC, by contrast, offers no justification. Instead, in moving for summary judgment, it asserts that, its conduct did not constitute disability discrimination. It is incorrect. While much irrational and unfair treatment may remain unactionable, Congress in passing the Rehabilitation Act and the ADA singled out irrational disability discrimination in the provision of public services for a different fate. Public entities *must* provide reasonable accommodations to people with disabilities when they are able to do so. By assigning Williams to work he was incapable of doing because of his disability and then punishing him for it, CDOC violated federal disability law. Williams is entitled to a trial so that a factfinder may make a final determination of the reasonableness of CDOC's conduct and to determine damages.

**I.     CDOC Did Not Reasonably Accommodate Williams.**

CDOC makes two merits arguments as to Williams's ADA claims, one on causation and one on the reasonableness of his accommodation. Beginning with the latter, disability "law places an affirmative obligation on public entities to reasonably accommodate qualified individuals with disabilities to allow them to participate in its programs and services." *Brooks v. Colorado Dep't of Corr.*, 12 F.4th 1160, 1167 (10th Cir. 2021). CDOC does not contest that it is a public entity or that its actions blocked Williams meaningful access to some of its programs and services. Mot. 13–17. Instead, it argues that CDOC reasonably accommodated Williams's disability as a matter of law. *Id.* at 14–17.

---

[1] This Court and then the Tenth Circuit Court of Appeals ruled in Williams's favor on the religious liberty claim at issue. *See Williams v. Hansen*, 5 F.4th 1129, 1136 (10th Cir. 2021). The case later settled. Ex. M at 36.

The determination of the reasonableness of an accommodation is highly context-specific and therefore typically left for resolution by a factfinder. *See Brooks*, 12 F.4th at 1170; s*ee also J.D. by Doherty v. Colonial Williamsburg Found.*, 925 F.3d 663, 675 (4th Cir. 2019) ("Our discussion thus far exemplifies the fact-intensive nature of this reasonableness inquiry. Such an inquiry is best left to a jury, who can weigh the competing evidence and make credibility determinations. Because [the plaintiff] has put forth evidence from which a jury may infer that the requested modification is reasonable under these circumstances, we hold that there is a genuine dispute of material fact on reasonableness."); *Brown v. D.C.*, 928 F.3d 1070, 1090 (D.C. Cir. 2019) ("the reasonableness of a proposed accommodation is a contextual and fact-specific inquiry"); *Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002) ("Determining whether an accommodation is reasonable requires a 'fact-specific, individualized analysis of the disabled individual's circumstances and the accommodations that might allow [the plaintiff] to meet the program's standards.'"). This principle is consistent with other legal questions of reasonableness, including in institutional responses to a plaintiff's request for accommodation. *See, e.g.*, *Tabura v. Kellogg USA*, 880 F.3d 544, 551 (10th Cir. 2018) (holding in Title VII religious discrimination case where employee sought employment accommodations for his religious practice that "[d]etermining what is reasonable is a fact-specific determination that must be made on a case-by-case basis.").

CDOC argues that it reasonably accommodated Williams's disability as a matter of law by providing him work restrictions. Mot. 16. He cannot contest the effectiveness of those restrictions, it argues, because he never actually worked in the kitchen. *Id.*

CDOC's treatment of Williams's disability may indeed have constituted a reasonable accommodation but for one fact: CDOC severely punished him for failing to report to a job site in

8

the midst of a medical emergency when his own supervisor did not allow him to work because of his disability, even on his best days. As CDOC acknowledges elsewhere, the "discriminatory act was the CDOC's reclassification of Williams as a close custody inmate whereas he was previously classified as medium custody." Mot. 14. *This* was the moment when CDOC failed to accommodate his disability, and CDOC simply ignores this action and how it fits into the reasonableness inquiry. *See Gandy v. Zavaras*, No. 09-CV-00205, 2010 WL 551408, at *2 (D. Colo. Feb. 11, 2010) (holding that an incarcerated plaintiff stated an ADA claim when CDOC submitted him to urinary drug tests that he struggled to perform because of a medical condition that made urinating difficult and then sanctioned him for failing to submit a sample).

The central question of this case, which CDOC's motion leaves unanswered, is why did CDOC punish Williams so severely for not reporting to work on September 23, 2019? Williams provides one possible answer: it was an act of retaliation by CDOC employee Simon Denwalt. Ex. M at 131–32; Ex. I. Even if this Court could resolve disputed questions of material fact on summary judgment, the only contesting answer CDOC even hints at is that the reclassification committee's decision was automatically triggered by Gonzales's report. Mot. 8.

The record does not support that conclusion, however, and it is entirely implausible. Gonzales testified that his report was neither a moral condemnation nor a medical evaluation but rather a routine administrative tracking of prisoners. Ex. N at 27. Whether Williams could work or not was irrelevant; keeping track of prisoners' whereabouts was his task. *Id.* at 30–31. Gonzales described the incident report as "normal," something "done all the time," because "[s]ome people like to work in the kitchen, and some people did not like to work." *Id.* at 29–30. "Refused to work" was an administrative term of art that just meant that someone was not at work without a permit. *Id.* at 37–38. Gonzales testified that prisoners refusing to work was common and described getting

9

prisoners to work as "the biggest issue" at Buena Vista. *Id.* at 34. Later, Gonzales testified, "half of them refuse to go to work … it's pretty comical … that's the job, stopping them from hurting each other and getting them to go to work." *Id.* at 57. Gonzales described Williams as "great to work with," said he "had a really good attitude," and described him as the sort of prisoner that staff would want on their unit. *Id.* at 48, 57.

When Gonzales was asked whether his September 23, 2019 report could have triggered Williams's reclassification, he was incredulous. "One-offs," he testified about his write-up, "don't really matter." *Id.* 53. He had "never heard of a one-off doing that." *Id.* If his write-up, and his write-up alone triggered a reclassification, he did not "think that would be normal." *Id.* at 54. Williams "must have gotten many additional write-ups," Gonzales testified and "assume[d] that's why he got reclassified." *Id.* at 55. "If he gets five reports or something like that, then guess what? Now you're moving out of the house because you're refusing to work." *Id.* at 44.

A second weakness in CDOC's explanation of events is its reliance on Williams obtaining his lay-in after he failed to report instead of before. While this delay is certainly the reason for Gonzales's incident report, *id.* at 24, that does not explain why CDOC reclassified Williams weeks later for failure to work. CDOC provides no policy or testimony as to this being a general practice, and it is hard to imagine why it would be.[2] Williams was unable to see a nurse over the weekend but did see a CDOC nurse on September 23 who gave him a lay-in, stating that he should not work for the next ten days. *See* Ex. D. The lay-in clearly stated that Williams should not work for "10 days" and that he should resume work on October 3, 2019, which is eleven days after September

---

[2] If Williams had a heart attack or fell into a coma moments before he reported to work, would he have been sanctioned for missing work because he only received a medical lay-in slip afterward?

23, indicating that September 23 was one of the ten days for which Williams was excused from attending work. *See id.*

CDOC also argues that it was not on notice of Williams's need for accommodation, blaming Williams for not explaining that his "work restrictions were insufficient" or for not "request[ing] an interactive ADA process with his food service supervisor." Mot. 16–17. Williams, however, has never argued that his work restrictions were insufficient. There was, therefore, no need to perform the ADA interactive process with his supervisor. Williams's supervisor in the kitchen, not him, was the one who found his restrictions too limiting to perform any task in the kitchen, immediately sending him back every day. Ex. M at 66. CDOC again seeks to shift focus away from the actual moment of disability discrimination: the punishment of Williams for being unable to work.

After Williams was punished, he did file an offender grievance seeking an accommodation, explaining that he had been assured that food service would accommodate his disabilities, that he was never provided an accommodation form, and that he had been punished through the failure to accommodate him. Ex. J. He requested an accommodation process for any future job placement because of the failure of the process in food service. *Id.* While this grievance was unnecessary to put CDOC on notice of his need for an accommodation, it demonstrates Williams's efforts to put them on notice as soon as he was aware that he was being punished because of CDOC's own failure to accommodate. He also appealed his classification decision, explaining he had been turned away from food services and had never refused to work. Ex. I.

Finally, CDOC argues that Williams is entitled only to a reasonable accommodation, not to the precise accommodation he wants. Mot. 17. Certainly so. Many accommodations would likely have been reasonable, perhaps including finding a kitchen task he could do, simply keeping

11

him in his phantom kitchen position, or transferring him to a different category of job that he was physically capable of doing. For example, in July 2019, when Williams was assigned to the kitchen and immediately received a medical lay-in, he contacted his unit manager and asked to be returned to his previous job as a porter doing custodial work. Ex. O. CDOC's action, however, was to prevent him from working in the kitchen and then severely punish him for not. This was not merely imperfect or not Williams's first option; it was an unreasonable failure to accommodate his disabilities under federal disability law.

## II. Williams's Disability Caused His Reclassification.

The other merits issue CDOC disputes is causation. "[H]is reclassification," Defendant writes, "was the result of his refusal to appear for his job assignment on a particular day without prior permission, *not* the fact that he had medical conditions or had allegedly sought to accommodate those conditions at an earlier date." Mot. 14. There are three reasons that independently prevent Defendant from obtaining summary judgment on this ground.

First, CDOC's framing of disability law's causation standard is borrowed from intentional discrimination claims, not failure to accommodate claims. A courthouse may fail to build an elevator "because of" cost reasons. *Cf. Tennessee v. Lane*, 541 U.S. 509, 513 (2004). A local criminal court may have a deaf detainee appear at his probable cause hearing by phone "because of" administrative convenience. *Cf. Robertson v. Las Animas Cnty. Sheriff's Dep't*, 500 F.3d 1185, 1189 (10th Cir. 2007). A prison may deny an incontinent prisoner a bathroom pass "because of" security concerns. *Cf. Brooks v. Colorado Dep't of Corr.*, 12 F.4th 1160, 1166 (10th Cir. 2021). The plaintiffs in these cases nonetheless may have valid Title II claims. The public entities naturally have other motivations given that what has rendered them liable is not their actions but their failure to act—that is, to meet the affirmative obligation to accommodate. Such is the case

here: Williams did not report to work because of his disability, and the failure to report to work is what caused him to lose meaningful access to many of the prison's services. That is sufficient to establish causation, and that CDOC claims a motivation other than disability-based animus does not defeat it. *Punt v. Kelly Servs.*, 862 F.3d 1040, 1048 (10th Cir. 2017) ("The only reason an accommodation is required is because of the disability, and thus the failure to provide a reasonable accommodation to a qualified employee with a disability is inherently 'on the basis of disability,' 42 U.S.C. § 12112(a), regardless of the [defendant's] motivation.").

Second, even borrowing Defendant's standard, CDOC seeks facts read in the light most favorable to it when it asserts that "another fact independent of his medical conditions actually led to his reclassification." Mot 14. Record evidence shows that this fact, his writeup for failure to work, was not a "fact independent of his medication conditions" at all but, instead, a fact that was a direct result of his medical conditions. His supervisor did not allow him to work in the kitchen because of his disability-based restrictions. Ex. M at 66. And the morning that he did not report he did so because of severe pain, a decision that CDOC's own medical staff ratified by providing him a lay-in later that same day, one that applied to September 23. Ex. M at 91–92; Ex. D. His write-up was therefore inseparable from his disability and thereby satisfied both the ADA and the Rehabilitation Act's causation requirements.

Finally, Williams testified that he was reclassified for a different reason: retaliation. Ex. M at 131–32; Ex. I. Per Williams, a different motivation entirely was the cause of his reclassification and this Court should not resolve the factual dispute in favor of Defendant. As described in detail above in Section I, doing so would be particularly inappropriate here because Defendant's causal explanation for its behavior is so implausible.

### III.     Defendant Was Deliberately Indifferent.

As CDOC explained in its motion for summary judgment, to obtain damages under federal disability law a plaintiff must demonstrate that a public entity was aware that there was a substantial risk to plaintiff's federal protected right but failed to act upon that chance. Mot. 8–9. This Court has recognized that vicarious liability applies to the ADA, meaning that a public entity is liable for the deliberate indifference of any of its employees. *M.P. by & through Jared P. v. Jones*, No. 22-CV-00220, 2023 WL 5938915, at *15 (D. Colo. Sept. 12, 2023); *A.V. through Hanson v. Douglas Cnty. Sch. Dist. RE-1*, 586 F. Supp. 3d 1053, 1067 (D. Colo. 2022); *Mullen v. Bd. of Commissioners of the Cnty. of Adams*, No. 21-CV-02398, 2022 WL 17261428, at *4 (D. Colo. Nov. 29, 2022). These rulings align this Court with a majority of the circuit courts that have addressed the question. *Delano-Pyle v. Victoria Cnty., Tex.*, 302 F.3d 567, 575 (5th Cir. 2002); *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1141 (9th Cir. 2001); *Rosen v. Montgomery Cnty.*, 121 F.3d 154, 157 n.3 (4th Cir. 1997); *DeVito v. Chicago Park Dist.*, 83 F.3d 878, 881 (7th Cir. 1996). CDOC does not argue for a different standard and appears to analyze the question in a manner that acknowledges vicarious liability. *See* Mot. 8 (analyzing deliberate indifference by what a single employee, Officer Gonzales, "was aware of.").

CDOC was aware of and disregarded a risk that it was failing to accommodate Williams's disabilities. Its awareness of Williams's need for an accommodation was overwhelming. CDOC's own medical staff diagnosed Williams with degenerative disc disease and bilateral neuropathy and were actively treating it. Ex. M at 10–12. Its own medical staff wrote up and then renewed his work restrictions. Ex. B. CDOC assigned him to the kitchen in July 2019, and then its medical staff immediately provided him a lay-in because he was medically incapable of doing the work. Ex. M at 80–81; Ex. D. During his lay-in, Williams contacted CDOC and requested his old job as

a porter doing janitorial work so that he could be assigned to work he was capable of doing. Ex. O; Ex. M at 112. CDOC reassigned him to the kitchen again in September 2019 and its own supervisor prevented him from working there every single day. Ex. M at 66. Perhaps most critically, its medical staff then provided him a lay-in saying he was ineligible to work starting on September 23, 2019, the date that he did not report. Ex. D. No record evidence establishes the decision to punish Williams was a result of "bureaucratic slippage" or "negligence." *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001). CDOC was aware that Williams was unable to work in the kitchen because of his disabilities and severely punished him for a failure to work anyway.

CDOC argues that "there is no evidence in the record suggesting that the Officer Gonzales was aware of any of Williams's prior lay-ins when he wrote the incident report that triggered Williams's termination and subsequent reclassification." Mot. 8. There is not, but the knowledge of Officer Gonzales is irrelevant—Williams does not argue that Gonzales did anything wrong. As described in detail in Section I, when Williams was unable to report to work, Officer Gonzales was justified in writing an incident report noting as such. Ex. N at 37–39. Other staff members' decision to reclassify Williams, however, was not inevitably "triggered" by Gonzales's report as CDOC suggests but instead was the optional and difficult-to-understand choice to severely punish Williams for conduct that was both widespread at Buena Vista and the result of his disability. By doing so, despite knowing about Williams's disabilities and their impact on his ability to work, CDOC knowingly disregarded a risk to his right to a reasonable accommodation under federal disability law.[3]

---

[3] The Tenth Circuit has held that defendants were plausibly deliberately indifferent under the much higher standard of the Eighth Amendment on strikingly similar facts. *See Ingram v. Clements*, 705 F. App'x 721, 726 (10th Cir. 2017) (holding that a defendant "was deliberately indifferent to the

## CONCLUSION

CDOC's motion for summary judgment should be denied.

Respectfully submitted December 14, 2023.

/s/ Samuel Weiss
Samuel Weiss
RIGHTS BEHIND BARS
416 Florida Avenue NW, #26152
Washington, DC 20001

Counsel for Plaintiff Charles Williams

---

dangers posed by approving [plaintiff] for kitchen work—work that requires prolonged standing and heavy lifting—notwithstanding a medical order limiting his standing").

## CERTIFICATE OF SERVICE

I hereby certify that on January 19, 2024, I electronically served the foregoing Opposition to Motion for Summary Judgment upon all parties.

Date:   January 19, 2024

*/s/ Samuel Weiss*
Samuel Weiss

RIGHTS BEHIND BARS
416 Florida Avenue NW, #26152
Washington, DC 20001

17