**CHARLES LAMONT WILLIAMS - September 21, 2023**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-02595-NYW-NRN

-----------------------------------------------------

VIDEO-RECORDED DEPOSITION OF
CHARLES LAMONT WILLIAMS
September 21, 2023

-----------------------------------------------------

Petitioner:

CHARLES WILLIAMS,

v.

Defendant:

COLORADO DEPARTMENT OF CORRECTIONS.

-----------------------------------------------------

APPEARANCES:

        RIGHTS BEHIND BARS
                By Samuel D. Weiss, Esq.
                    416 Florida Avenue NW
                    Suite 26152
                    Washington, DC 20001
                    sam@rightsbehindbars.org
                        Appearing on behalf of Plaintiff

Exhibit M

**CALDERWOOD-MACKELPRANG, INC.**
**(303) 477-3500**

**CHARLES LAMONT WILLIAMS - September 21, 2023**

```
 1   APPEARANCES (continued):

 2        COLORADO ATTORNEY GENERAL'S OFFICE
               By Ann Stanton, Esq.
 3               Gregory Bueno, Esq.
               Civil Litigation & Employment Section
 4             1300 Broadway, 10th Floor
               Denver, Colorado 80203
 5             720-508-6000
               ann.stanton@coag.gov
 6             gregory.bueno@coag.gov
                 Appearing on behalf of Defendant
 7
     Also Present:  Walt Mathern, Videographer
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**CHARLES LAMONT WILLIAMS - September 21, 2023**

1        Pursuant to Notice and the Colorado Rules

2  of Civil Procedure, the video-recorded deposition

3  of CHARLES LAMONT WILLIAMS, called by Defendant,

4  was taken on Wednesday, September 21, 2023,

5  commencing at 9:34 a.m., at the Attorney General's

6  Office, 1300 Broadway, 10th Floor, Denver,

7  Colorado, before Lisa A. Dague, Certified Shorthand

8  Reporter and Notary Public within and for the State

9  of Colorado.

10

11

12                 I N D E X

13  DEPOSITION OF CHARLES LAMONT WILLIAMS

14  EXAMINATION BY:                   PAGE

15     Ms. Stanton                  5

16     Mr. Weiss               153

17

18                        INITIAL

    EXHIBITS                   REFERENCE

19

20  Exhibit 1    Complaint and Request for    8
                Relief

21  Exhibit 2    Job Program/Assignments    36

22  Exhibit 3    Clinical Orders    63

23  Exhibit 4    Administration Regulation,   72
                Americans with Disabilities

24                  Act-Offender Request for
                Accommodations

25

**CHARLES LAMONT WILLIAMS - September 21, 2023**

| | | INITIAL |
|---|---|---|
| 1 | EXHIBITS (Continued) | REFERENCE |
| 2 | | |
| | Exhibit 5    BVCC Food Service Assignment, | 79 |
| 3 | 7/13/2019 | |
| 4 | Exhibit 6    Memorandum to Charles Williams | 83 |
| | from Lt. M. Class, 9/9/2019 | |
| 5 | | |
| | Exhibit 7    Message from Medical, Dr. Rose | 88 |
| 6 | to Charles Williams, 9/8/2020 | |
| 7 | Exhibit 8    CDOC Clinical Services Lay-In | 93 |
| | Slips | |
| 8 | | |
| | Exhibit 9    Offender Grievance, 8/6/19, | 111 |
| 9 | Step 2 | |
| 10 | Exhibit 10   Offender Grievance, 12/23/19, | 114 |
| | Step 2 | |
| 11 | | |
| | Exhibit 11   Offender Grievance, 11/4/19, | 116 |
| 12 | Step 1 | |
| 13 | Exhibit 12   Offender Grievance, 12/23/19, | 118 |
| | Step 2 | |
| 14 | | |
| | Exhibit 13   Offender Grievance, 1/21/20, | 119 |
| 15 | Step 3 | |
| 16 | Exhibit 14   CHRONLOG | 125 |
| 17 | Exhibit 15   Offender Appeal, 10/3/19 | 130 |
| 18 | Exhibit 16   Plaintiff's Responses and | 135 |
| | Objections to Defendant's | |
| 19 | First Written Discovery Requests | |
| | Plaintiff | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

CHARLES LAMONT WILLIAMS - September 21, 2023

1  later, page 13 of 16 in the top right corner, do

2  you see where it says, "Count II - Rehabilitation

3  Act"?

4        A    I do.

5        Q    Are these the two claims that you're

6  bringing in this lawsuit?

7        A    I believe so.

8        Q    And there aren't any other claims that

9  you're bringing?

10        A    I would say not at this time, right?

11        Q    Okay.  Mr. Williams, do you have any

12  disabilities or medical conditions?

13        A    I have degenerative disc disease and

14  bilateral neuropathy.

15        Q    Any other disabilities?

16        A    Diabetes, if you call that a disability.

17  I think that's it.

18        Q    Okay.  For your degenerative disc

19  disease, when were you diagnosed with it?

20        A    I want to say around 2015 is when the

21  pain started.  Jeez, within two years of that.

22        Q    Who diagnosed you with degenerative disc

23  disease?

24        A    I don't remember the doctor's name,

25  actually.

CHARLES LAMONT WILLIAMS - September 21, 2023

1    Q    Was this somebody within the Department

2  of Corrections?

3    A    Yes.  Yeah.  She -- she was a contractor

4  for the Department of Corrections.

5    Q    And just to be clear for the record, if I

6  say "DOC" or "CDOC," do you understand that to mean

7  the Colorado Department of Corrections?

8    A    I do.

9    Q    Okay.

10    A    And her name was Dr. Loftin.

11    Q    Dr. Loughlin?

12    A    Yeah.  Loftin.

13    Q    Loftin.  L-O-F-T-I-N?

14    A    I have no idea.  I'm pretty sure it's in

15  there somewhere.

16    Q    Okay.  How does your degenerative disc

17  disease affect you?

18    A    It causes pain in my lower back as well

19  as my feet.

20    Q    Have you ever received any treatment for

21  it?

22    A    Yes.

23    Q    What kind of treatment?

24    A    In prison or ever?

25    Q    Ever.

CHARLES LAMONT WILLIAMS - September 21, 2023

1      A      They gave meloxicam and acetaminophen.
2  That was it.
3      Q      Was that in prison?
4      A      Yes.
5      Q      Did you receive the same medication
6  outside of prison?
7      A      No.  Meloxicam is not a very good drug, I
8  guess.  So I'm on acetaminophen and ibuprofen now.
9      Q      Have you received any other sort of
10  treatment for it?
11      A      Can you explain "treatment"?
12      Q      Medication, like you -- like you said,
13  surgery, physical therapy?
14      A      I had one meeting with a physical
15  therapist in prison.  I'm scheduled for that --
16  well, let me rephrase that.  I'm not scheduled for
17  that, but my primary physician and I are discussing
18  it.
19      Q      Okay.
20      A      I saw -- jeez, give me a minute, please.
21  I saw a specialist about it, but there was no
22  follow-up.
23      Q      When did you see the specialist?
24      A      It was this year.  I would say -- no, you
25  know what, it may not have been.  I think it was in

**CHARLES LAMONT WILLIAMS - September 21, 2023**

1     Q     And you said it was medical mistreatment,
2  deliberate indifference.  Were there any other
3  issues that you raised in that case?
4     A     There were three claims, and deliberate
5  indifference was the major one.  There were some
6  claims -- I remember now.  There were some claims
7  for not allowing us -- it was a religious claim for
8  not allowing us to partake in our recognized
9  religion.
10     Q     Is that case still ongoing?
11     A     No.
12     Q     What was the outcome of it?
13     A     It was settled.
14     Q     Have you filed any other civil lawsuits?
15     A     No.
16     Q     Did you work while you were incarcerated
17  in DOC?
18     A     Yes.
19     Q     What jobs did you hold?
20     A     Mainly janitorial, and I was a barber for
21  a really long time.
22         MS. STANTON:  I'm going to pass out what
23  will be marked as Exhibit 2.
24         (Exhibit 2 was marked.)
25     Q     (BY MS. STANTON)  For the record, if you

CHARLES LAMONT WILLIAMS - September 21, 2023

1      A    I only took the rags and things that were

2    needed to laundry from food service, which was in

3    the same building.

4      Q    Okay.  And about how long would a shift

5    doing that take?

6      A    Four, maybe five hours.

7      Q    How many days a week were you assigned to

8    that?

9      A    Five days a week.

10     Q    I think you said you were diagnosed with

11   degenerative disc disease in 2015.  Do you remember

12   having any -- any back pain or symptoms of

13   neuropathy related to working in food service that

14   summer in 2015?

15     A    I didn't say that.  I said I was

16   diagnosed in 2017.  I said the pain started in

17   2015.

18     Q    Okay.  I'm sorry.  Thank you for

19   clarifying that.  The pain started in 2015.  You

20   were diagnosed in 2017.

21     A    And that's about the time, if that's what

22   you're asking me, of when it really started.

23     Q    Okay.  Do you remember experiencing that

24   pain while you worked in food service?

25     A    I do.

CHARLES LAMONT WILLIAMS - September 21, 2023

1   have work restrictions?

2       A    I did.

3       Q    When did you have work restrictions in

4   place?

5       A    All this time.  From, I want to say,

6   2017, those restrictions were placed on when I

7   started seeing Dr. Loftin, and then I had -- Damon

8   was her last name, Heather Damon, and she kept up

9   on the work restrictions.

10           (Exhibit 3 was marked.)

11      Q    (BY MS. STANTON)  I'm going to introduce

12  another exhibit here.  It may take me a moment to

13  pull out each copy.  So this is marked as

14  Exhibit 3.  And do you see in the bottom left page,

15  it says, "Williams003"?

16      A    I do.

17      Q    Do you recognize this document?

18      A    I do.

19      Q    What is this document?

20      A    It's an exhibit that I added to -- or we

21  added to this complaint.

22      Q    And what -- what does the document tell

23  us?  What --

24      A    These are clinical orders given by my

25  provider, which was Heather Damon, and these are

CHARLES LAMONT WILLIAMS - September 21, 2023

1  work restrictions.

2       Q    And I see an encounter date that says

3  October 4 of 2018 at the top.  Do you see that?

4       A    I do.

5       Q    Is it your understanding that these

6  restrictions were put into place on October 4 of

7  2018?

8       A    Yep.  So give or take 30 days, this is

9  how it works every year.  So every year, these

10 restrictions have to be placed on again, and every

11 year they were placed on.  They expire after one

12 year.

13      Q    Okay.  Was this the first year that you

14 had work restrictions in place?

15      A    No.  No.  Dr. Loftin put most of these on

16 prior to me seeing Ms. Damon.

17      Q    And I see the top work restriction, the

18 first box says, "No Standing Over 2 Hours, Due to

19 bilateral peripheral neuropathy."  Do you see that?

20      A    I do.

21      Q    So tell me what that -- that work

22 restriction means.

23      A    It was specifically for food service,

24 because food service is an 8-to-12-hour shift, and

25 if I was -- reported to work and told them I

**CHARLES LAMONT WILLIAMS - September 21, 2023**

1 couldn't do the work, then I would be terminated

2 and moved to Lower North.

3         This was not really the onset of the

4 bilateral neuropathy, but -- so to explain things,

5 we're given a certain type of shoe in prison, and

6 in those type of boots, I couldn't stand for more

7 than two hours.

8     Q    So with this work restriction, was your

9 job supervisor able to access this, or did you have

10 to bring a piece of paper in showing it?

11     A    I kept one personally just in case, but

12 yeah, absolutely, all super -- everyone could see

13 this.  This would be in my general file, so you

14 wouldn't have to have any type of higher clearance

15 to get to this.

16     Q    Okay.  So when you brought this work

17 restriction to -- to work with you or when your

18 supervisor looked it up and saw it and they saw no

19 standing over two hours, what -- what did that tell

20 them?  What -- what could they do then?

21     A    Nothing, really.  I don't understand what

22 you mean, "What could they do?"

23     Q    Would they make sure you had a break

24 to -- to sit every two hours?

25     A    I never -- I never actually worked, so --

CHARLES LAMONT WILLIAMS - September 21, 2023

1  are you talking about in food service?

2         Q    In any of your jobs, food service --

3         A    Well, I never -- I never actually worked

4  more than two hours in any of those other jobs per

5  day -- well, yeah, I will say it like that, per

6  day.

7         Q    Okay.  So how about in food service then?

8         A    Those shifts are 8 to 12 hours long.

9         Q    So would the supervisor give you a break

10 to sit every two hours?

11        A    I don't know.  I never actually worked in

12 food service.

13        Q    You never actually did?

14        A    No, not one day.

15        Q    So all those times that you were assigned

16 to food service, you didn't actually go to work?

17        A    No.  They knew I had these.  I showed it

18 to them a few times.  And they would just send me

19 back to my housing unit.

20        Q    Okay.

21        A    I never actually spent any time in the

22 kitchen other than eating.

23        Q    And the next work restriction down on the

24 list, it says, "No Repetitive Bending at the Waist,

25 Chronic back pain."  Do you see that?

CHARLES LAMONT WILLIAMS - September 21, 2023

```
 1  accommodation?
 2      A    Yes.
 3      Q    And you see that it says under Number 1,
 4  "Any offender may request an accommodation at any
 5  time while under the supervision of DOC..."?
 6      A    Yes.
 7      Q    And look down towards the bottom where it
 8  says Number 3.  Do you see where it says, "To
 9  request accommodation..."
10      A    I see that.
11      Q    What does the rest of that line say?
12      A    "... offenders should complete and submit
13  the AR Form 750-04A, Offender Request for
14  Accommodation."
15      Q    Okay.  And the next line, lower case a,
16  it says, "AR Form 750-04A, Offender Request for
17  Accommodation can be obtained upon request from any
18  DOC or contract employee with access to DOCNET"?
19      A    Yes, I see that.
20      Q    I'm going to switch to -- it's about ten
21  pages or so back.  In the bottom right corner it
22  says DOC/WILLIAMS 00116.  Do you see this -- I'll
23  wait until you get there.
24      A    Yep.
25      Q    Do you recognize this form?
```

CHARLES LAMONT WILLIAMS - September 21, 2023

1    Q    And when were you hired at food service

2  for this assignment?

3    A    I don't think it says when I was hired,

4  but I was supposed to report to work on 7/13/2019.

5    Q    Okay.  That -- that's fine.

6    A    Oh, it does.  7/10, kitchen hire date.

7  Sorry, I didn't mean to talk over you.

8    Q    Oh, no, that's fine.  So your kitchen

9  hire date was July 10th, 2019, and your date to

10  report to work was July 13th, 2019?

11    A    Yes.

12    Q    And what was your -- what was your

13  assigned job in the kitchen?

14    A    It says, "PM Serving Line 1."

15    Q    And what -- do you know what inmates

16  assigned to PM Serving Line 1 did as their

17  responsibility?

18    A    I'm pretty sure they served the food.  I

19  mean, I worked in the kitchen prior to, you know.

20  So, yeah.  I mean, I'm sure there are other duties,

21  and I think it -- it might say on here.

22    Q    Did you --

23    A    I thought -- I'm sorry.  I was just going

24  to say I thought there was a line on there that

25  says that I was supposed to just do what I was

CHARLES LAMONT WILLIAMS - September 21, 2023

1  told, you know, like if I was directed.  But I

2  think that might be a different one or -- I don't

3  know.  I don't recall.  Sorry.

4      Q    Okay.  Do you have reason to believe that

5  you could not serve the food in that role as PM

6  Serving Line 1 because of your disabilities?

7      A    Yes.

8      Q    Why do you believe you wouldn't be able

9  to do that job?

10     A    I couldn't stand for a long period of

11 time and the bending.

12     Q    Do you think you would have been able to

13 take breaks because of your work restrictions

14 saying not to stand for more than two hours?

15     A    I don't know.  I'm not really familiar

16 with how that would work at all.

17     Q    I'm going to direct your attention to

18 Line 9 towards the bottom of the page under the

19 section that says, "BVCC Food Service."  Do you see

20 where it says, "Food Service staff are the only

21 staff that can lay in any assigned offender other

22 than Medical"?

23     A    I see that, yes.

24     Q    What does the rest of this line say?

25     A    "You are required to report to work every

CHARLES LAMONT WILLIAMS - September 21, 2023

1  show up to the kitchen when you were assigned to do

2  so?

3       A    Yes.

4       Q    And you said that the supervisor waved

5  you away?

6       A    Yeah.  Yes.

7       Q    Did you -- did you request to be

8  reassigned to a different job?

9       A    Yes.

10      Q    How did you make those requests?

11      A    Kites to my case manager, grievances.

12      Q    And what was it specifically that you

13 remember requesting?

14      A    I requested my job back that I was in the

15 unit, working in the unit as a custodian, special

16 duties.

17      Q    Did you prefer working as a custodian?

18      A    It's the least aggravating job, I guess.

19 Recreation is okay.  It all depends on the

20 supervisor.

21      Q    I'm going to introduce what will be

22 marked as Exhibit 6.

23      A    7.

24           THE COURT REPORTER:  7.

25      Q    (BY MS. STANTON)  7.  Exhibit 7.  It's a

CHARLES LAMONT WILLIAMS - September 21, 2023

1    September 23rd, 2019?

2         A    Yeah.  Yes.

3         Q    What time were you supposed to report to

4    work?

5         A    I don't know.  4:45 a.m.

6         Q    Did you report to work that day?

7         A    No, I did not.

8         Q    Why not?

9         A    Because I requested a medical

10   emergency --

11        Q    Why did you --

12        A    -- to see the provider.

13        Q    Why did you request a medical emergency?

14        A    Well, because my back pain was unbearable

15   at the time for the whole three days.  There's no

16   provider on Saturday and Sunday, so --

17        Q    Did you report to work that day?

18        A    No.

19        Q    Did you see a medical provider --

20        A    I did.

21        Q    -- at any time that day?

22        A    I did.

23        Q    What time did you see the medical

24   provider?

25        A    I can't tell you what time.  It's in

CHARLES LAMONT WILLIAMS - September 21, 2023

1   the -- there's a -- there should be a medical slip
2   where it says the date.  I don't know if the time
3   is on the -- on the lay-in, but it might be.  I
4   seen her as early as possible.  So that was
5   sometime that morning.
6        Q    So you said that previously you had
7   reported to work every day and you were waved away.
8   Why didn't you report to work that day?
9        A    Just my back was just -- it was like
10  three days' worth of just pain, and I figured why
11  would I bother if they're not going to send me to
12  work anyway.  I knew she would give me a lay-in,
13  so -- and she'll make it retroactive, so it
14  wouldn't really make any difference if I went or
15  not just to be told -- a lot of times I didn't even
16  make it two -- two feet past my unit.  I'd come out
17  the door, they would see me down the hall, just
18  tell me to go back.  So a lot of times I didn't
19  even walk up to the supervisor to speak to him.
20       Q    But the couple days before when you were
21  in severe pain, you had at least attempted to
22  report to work?
23       A    I did.  I did.  Like I said, I don't
24  really make it out of the unit.
25       Q    So why didn't you even attempt to make it

CHARLES LAMONT WILLIAMS - September 21, 2023

1    terminated from work that day?

2        A    Will you repeat that question?

3        Q    So with all the events that we've

4    discussed on September 23rd, 2019, were you

5    terminated from work that same day?

6        A    No.

7        Q    When were you terminated from work?

8        A    I have no idea.  Some point after --

9    after -- some point after that.

10       Q    And what was the reason that was given

11   for termination from work?

12       A    Failure to work.

13       Q    Were you placed on a restricted privilege

14   status for failure to work?

15       A    No.

16       Q    Did you get a COPD charge for failure to

17   work?

18       A    No.

19       Q    Did you face any other consequences for

20   not reporting to work that day?

21       A    Yes.

22       Q    What were those consequence?

23       A    I was reclassed and sent to close

24   custody.

25       Q    Did that happen on the same day or was it

CHARLES LAMONT WILLIAMS - September 21, 2023

1  a few days later?

2       A    I couldn't tell you.  I know it didn't

3  happen on July -- or September 23rd.

4       Q    So what -- what was your classification

5  before you were reclassed to close custody?

6       A    Minimum.

7       Q    Minimum?

8       A    I had negative 3 points or negative 2

9  points.

10      Q    Did you have to move to a new unit or a

11 new pod?

12      A    Yes.

13      Q    What changed about your day-to-day life

14 when you are reclassed?

15      A    I was in my cell 18 hours a day now.

16      Q    How many hours a day had you been in your

17 cell before that?

18      A    Twelve to -- yeah.

19      Q    Are there any other --

20      A    Maybe a little less.

21      Q    I'm sorry.  Go ahead.

22      A    Maybe a little less.

23      Q    Are there any other sort of practical

24 differences between minimum and medium custody and

25 close custody?

CHARLES LAMONT WILLIAMS - September 21, 2023

1        A     Yes.

2        Q     Like what?

3        A     Everything.  Your movement is restricted.

4    Your access to any type of programs is restricted.

5    Everything is restricted.  It's taken away.

6        Q     What do you mean by "restricted"?  Do you

7    mean you have limited time to do those things?  Do

8    you mean --

9        A     Everything.

10       Q     -- the schedule changes?

11       A     Restricted.  It's, yeah, everything.

12   Movement, time, everything is restricted.

13       Q     So what makes movement restricted?

14   What -- describe to me what that means.

15       A     All right.  You can't go anywhere.

16       Q     So where -- where would you go if you

17   didn't have movement restricted?

18       A     Rec, gym, library, law library, chow

19   hall, out to the yard that's attached to South

20   Unit, yeah.

21       Q     So with close custody, could you still go

22   to rec?

23       A     Sure.

24       Q     What do you mean by "sure"?

25       A     I mean, I explained that they stopped

CHARLES LAMONT WILLIAMS - September 21, 2023

1  allowing us to go to rec while I was in close

2  custody, so --

3       Q    Why was that?

4       A    I don't know.

5       Q    Could you still go to the chow hall?

6       A    They stopped us from going to the chow

7  hall while I was in close custody.

8       Q    Do you remember why that was?

9       A    No.

10      Q    Could you still go to the law library?

11      A    It's restricted, so less time and at

12  points not at all.

13      Q    When were those points that you couldn't

14  go at all?

15      A    When our unit was locked down, which was

16  all the time.

17      Q    All the time meaning?

18      A    We were locked down for different reasons

19  all the time.

20      Q    So do you mean 24/7, every single day, or

21  do you mean it happened frequently?

22      A    Very frequently.

23      Q    Okay.  What kinds of things led to

24  lockdowns?

25      A    I don't know.

CHARLES LAMONT WILLIAMS - September 21, 2023

1    Q    So did the reclass to close custody cause
2  you any physical injuries?
3    A    It aggravated my degenerative disc
4  disease for sure, lack of movement and being stuck
5  in that tiny little box.  The cells are smaller.
6  It's just -- yeah.
7    Q    Did you have a cellmate in close custody?
8    A    Sometimes.
9    Q    But not always?
10   A    Not always.
11   Q    Did you have a cellmate in minimum
12  custody also?
13   A    Yes.
14   Q    Just one cellmate?
15   A    Medium custody, yes, just one cellmate.
16   Q    I'm sorry, were you in medium custody or
17  minimum custody?
18   A    I was classified minimum.  I was in
19  medium.
20   Q    Okay.
21   A    And incentive units are considered
22  medium -- or minimum restricted because of the
23  allowances that they give us, more time out of our
24  cells, more access to rec, more access to
25  everything.  Xboxes and all those other things are

**CHARLES LAMONT WILLIAMS - September 21, 2023**

1   considered security issues, I would say, and so you

2   have to be at a certain level to gain certain

3   privileges.

4        Q    So if you're in medium custody but in the

5   incentive unit, it acts a little bit like being in

6   minimum custody?

7        A    Minimum restricted.

8        Q    Okay.

9        A    Which is a step above minimum.  It's

10  between medium and minimum.

11       Q    Okay.  So you talked about some of the

12  injuries.  You said that being in close custody

13  exacerbated or aggravated your --

14       A    Yeah.

15       Q    -- your back pain.  What about your foot

16  pain?

17       A    Yeah.  I mean, the foot pain comes from

18  the back pain.  So, yeah, it did both.

19       Q    Were you able to -- did you have day hall

20  time or pod time?

21       A    We did.

22       Q    Were you able to move around and relieve

23  some of your back pain --

24       A    Yes.

25       Q    -- and foot pain then?  How often did

CHARLES LAMONT WILLIAMS - September 21, 2023

1    Q    The days that you could go to the gym,

2   how many times a day could you go?

3    A    Once.

4    Q    Once a day?

5    A    And it was scheduled twice a week.

6    Q    Did you have access to the -- the

7   equipment that you needed to -- to do your core

8   exercises?

9    A    When we were allowed to go to the gym,

10  yeah.

11   Q    And when you were allowed to go to the

12  gym, did you have access to the pull-up bar also?

13   A    Yes.

14   Q    Do you remember how long you were -- you

15  were in close custody?

16   A    I think it was two years.

17   Q    And what led to being reclassed again?

18   A    To get out of it?

19   Q    Yes.

20   A    I think I -- I was out working, and I

21  caught one of the case managers and asked if I

22  could get reclassed to get out -- or I think I

23  asked him why hadn't I been able to leave.  And

24  they reclassed me, and I went before the

25  classifications committee, and they moved me to

**CHARLES LAMONT WILLIAMS - September 21, 2023**

1    Q    And what happened then?

2    A    I got moved from the incentive unit to

3    medium custody and then back to the incentive unit.

4    Q    And what was it that you were asking for

5    in the grievance?

6    A    My job reinstated in South Unit.  I never

7    received my Step 1 response.

8    Q    Okay.  Do you see the response to this

9    Step 2 grievance, the typed portion towards the

10   bottom?

11   A    I do.

12   Q    It says -- do you see where it says, "You

13   were moved from South Unit for investigation of an

14   incident that occurred in the unit.  Once that

15   investigation was completed and no COPD charges

16   were brought against you, I, Captain John

17   Nitsch," I think, N-I-T-S-C-H, "did approve you to

18   be moved back to the Incentive Unit in South."

19        What happened with your request to be

20   rehired as a porter?

21   A    The job board stopped it.

22   Q    Why did the job board stop it?

23   A    Don't know.

24   Q    What were you told was the reason in this

25   grievance response?

CHARLES LAMONT WILLIAMS - September 21, 2023

1    A    Yes.

2    Q    -- or you submitted?  And is this an

3    appeal of the classification decision moving you to

4    close custody when you were terminated from food

5    service?

6    A    Sorry, say that again.

7    Q    Is this the appeal of the classification

8    decision when you were moved to close custody?

9    A    Yes, yes.

10   Q    And what were you -- what were you

11   arguing should be the reason that your

12   classification decision should be appealed?

13   A    I don't understand the question.

14   Q    Why were you appealing the decision?

15   What do you think went wrong with the decision to

16   move you to close custody?

17   A    I never -- I never refused to work, so I

18   never received a disciplinary report for refusal to

19   work.  And so that's what I was stating, that it

20   was retaliatory by Denwalt.

21   Q    What made you believe that it was

22   retaliatory?

23   A    I know it was.  I know it was, because

24   that's what he does.

25   Q    What do you mean, "that's what he does"?

**CHARLES LAMONT WILLIAMS - September 21, 2023**

1    A    Well, I had been there eight years.  He

2  was the head case manager for seven and a half, and

3  that's what he does.  He retaliates against people.

4  He reclasses people when he doesn't like them.  And

5  him and I had gotten in multiple arguments.

6    Q    What kinds of arguments?

7    A    About different things.

8    Q    So what -- what was he retaliating for in

9  your mind?

10    A    Well, I filed grievances against him and

11  the lawsuit that I filed prior to this one.

12    Q    And so I see in the first line here you

13  said that you had a lay-in for the date that you

14  were fired from work and had submitted medical

15  emergencies.  Is that -- do you see that as well?

16    A    I do.

17    Q    And do you see your signature kind of in

18  the middle of the page, and do you see the date of

19  October 6, 2019?

20    A    I do.

21    Q    Did you submit this form on October 6,

22  2019?

23    A    Yes.

24    Q    And what -- do you see the box that says,

25  "Hearing decision" below that?